**THE LAW OFFICE OF PAUL K. JOSEPH, PC**
PAUL K. JOSEPH (SBN 287057)
*paul@pauljosephlaw.com*
4125 W. Pt. Loma Blvd., No. 206
San Diego, CA 92110
Phone: (619) 767-0356
Fax: (619) 331-2943
***Counsel for Plaintiff and the Proposed Class***

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREA NATHAN, on behalf of herself, all others similarly situated and the general public,<br><br>Plaintiff,<br><br>v.<br><br>VITAMIN SHOPPE, INC.,<br><br>Defendant. | Case No: 3:17-cv-01590-BEN-KSC<br><br><u>CLASS ACTION</u><br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CAL. BUS. & PROF. CODE §§17200 *et seq.*; CAL. BUS. & PROF. CODE §§17500 *et seq.*; CAL. CIV. CODE §§ 1750 *et seq.*; and BREACH OF EXPRESS & IMPLIED WARRANTIES**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Andrea Nathan, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby sues Vitamin Shoppe Inc., ("Defendant"), and alleges the following upon her own knowledge, or where she lacks personal knowledge, upon information and belief and the investigation of her counsel.

## **INTRODUCTION**

1.    Defendant markets Vitamin Shoppe brand "Garcinia Cambogia Extract," (the "Product"), a dietary supplement that Defendant falsely claims is an effective aid in "weight management" and "appetite control" despite that its only purportedly "active" ingredients are scientifically proven to be incapable of providing "weight management" and "appetite control" benefits.

2.    Plaintiff read and relied upon Defendant's claims when purchasing the Product and was damaged as a result in that she lost money.

3.    Plaintiff brings this action challenging Defendant's misleading "weight management" and "appetite control" claims relating to the Product on behalf of herself and all others similarly situated consumers in California, alleging violations of the California Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq*. ("CLRA"), Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*. ("UCL"), and False Advertising Law, *id*. §§ 17500 *et seq*. ("FAL"). Plaintiff further alleges that Defendant breached express and implied warranties under state law.

4.    Plaintiff seeks an order compelling Defendant to (a) cease marketing the Product using the misleading and unlawful tactics complained of herein, (b) restore the amounts by which it has been unjustly enriched, and (c) pay restitution, damages, and punitive damages as allowed by law.

## **PARTIES**

5.    Plaintiff Andrea Nathan is a resident of San Diego, California.

1

6.    Defendant Vitamin Shoppe Inc., is a Delaware corporation with its principal place of business in New Jersey. Defendant is registered to do business in California as entity number C3656948.

## JURISDICTION & VENUE

7.    The California Superior Court has jurisdiction over this matter as a result of Defendant's violations of the California Business and Professions Codes, California Civil Codes, and California common law principles.

8.    The aggregate monetary damages and restitution sought herein exceed the minimum jurisdictional limits for the Superior Court and will be established at trial, according to proof.

9.    The California Superior Court also has jurisdiction in this matter because there is no federal question at issue, as the issues herein are based solely on California statutes and law.

10.    The Court has personal jurisdiction over Vitamin Shoppe because it has purposely availed itself of the benefits and privileges of conducting business activities within California.

11.    Venue is proper in San Diego County because Plaintiff resides in San Diego, California, and a substantial part of the events or omissions giving rise to the claims occurred in San Diego.

## FACTS

**IV.    Scientific Research Demonstrates that Garcinia Cambogia Extract (HCA) Is Not Effective in Supporting Appetite Control, Weight Management, or Weight Loss**

12.    Obesity is the net result of disrupted balance between energy intake and energy output, the excess being stored in the adipose tissue.

13.    In order for a supplement to be effective in aiding weight management, it must help users either (1) lower their energy intake, (2) increase their energy output, or (3) otherwise alter the manner in which the body processes the energy they consume.

14.    Rigorous, placebo controlled studies establish that HCA does not lower energy intake, increase energy expenditure, or otherwise, alter the manner in which the body stores or burns fat or glucose, which are the only biological mechanisms of action HCA is purported to affect.

**A.    HCA does not support appetite control and thereby lower energy intake**

15.    Randomized, placebo controlled scientific studies demonstrate that Garcinia Cambogia Extract and/or HCA does not provide appetite control benefits in humans. In fact, the only reliable scientific evidence demonstrates it is no more effective as an appetite control aid than a placebo.

16.    In 2001, a study published in the Journal of Physiology and Behavior found that HCA was no more effective than a placebo in supporting appetite control.[1]

17.    The authors had "hypothesized that HCA supplementation might affect BW [body weight] regulation by inducing satiety and reducing food intake,"[2] but found to the contrary that "supplementation with HCA . . . did not result in increased satiety or decreased energy intake compared to placebo."[3]

18.    To determine whether HCA supported appetite control, the study measured participants hunger, appetite, anticipated food intake, desire to eat, fullness, satiety, and thirst. There was no statistically significant difference between HCA and a placebo on any of these appetite variables.[4]

19.    Likewise, HCA supplementation did not reduce energy intake compared to a placebo. Rather, "[t]wenty-four-hour energy intake was similar in all treatments for both men

---

[1] E. Kovacs et al., *Effects of 2-week ingestion of (-)-hydroxycitrate and (-)-hydroxycitrate combined with medium-chain triglycerides on satiety and food intake*, 74 Physiology & Behavior 543 (2001) [hereafter "Kovacs I"].

[2] *Id.* at 544.

[3] *Id.* at 543.

[4] *Id.* at 546, Table 2.

. . . and women."[5] There was only one statistically significant instance where energy intake was difference for any meal: "energy intake during lunch was *higher* with HCA compared to PLA[CEBO], in the women, [] in contradiction to the original hypothesis"[6] (emphasis added).

20.    Thus, the study "showed that HCA . . . [was] not effective with respect to satiety and energy intake . . . ."[7]

21.    In short, there was "no effect of HCA on satiety."[8]

22.    In 2001, a related study publish in the International Journal of Obesity found that "[t]wo-week supplementation with HCA . . . did not result in increased satiety, fat oxidation, 24 h EE [energy expenditure] or BW [body weight] loss."[9]

23.    The study employed a "double-blind, placebo-controlled, randomized, cross-over design" and specifically examined the effects of HCA *alone* and HCA in combination medium-chain triglycerides on "satiety, fat oxidation, energy expenditure and body weight."[10]

24.    As "[i]n [their] previous study," which found "no effect of HCA on satiety,"[11] this study found that HCA "did not result in increased satiety, fat oxidation, 24 h EE [energy expenditure] or BW [body weight] loss compared to PLA[CEBO]."[12]

25.    "The 24 h AUC of hunger, satiety, fullness, desire to eat, appetite, anticipated food intake and thirst were similar in all treatments. . . . There was no difference at any time

---

[5] *Id.* at 546.

[6] *Id.* at 547.

[7] *Id.* at 548.

[8] E. Kovacs et al., *The effects of 2-week ingestion of (--)-hydroxycitrate and (--)-hydroxycitrate combined with medium-chain triglycerides on satiety, fat oxidation, energy expenditure and body weight*, 25 Int. J. Obes. 1087, 1088 (2001) [hereafter, "Kovacs II"] (citing Kovacs I).

[9] *Id.* at 1087.

[10] *Id.* at 1088.

[11] *Id.*

[12] *Id.* at 1087.

point in hunger, desire to eat, appetite, and anticipated food intake between treatments." The only significant difference between HCA and placebo related to appetite control was that satiety "was higher with PLA compared to HCA before sleeping."[13]

26.    Thus, "[t]he results did not support the hypothesis that HCA supplementation may be effective on appetite and weight control."[14]

27.    Rather, "HCA was not effective"[15] in "increase[ing] satiety, fat oxidation, 24 h EE or BW loss compared to PLA[CEBO]."[16]

28.    Similarly, a 2011 study of the effect of Garcinia Cambogia Extract ("GCE"), concluded that there was "[n]o effect of . . . GCE supplementation on energy intake" and actually found "an increase in both energy and cholesterol consumption within all groups during the study."[17]

29.    Accordingly, the study concluded that "[i]n agreement with past studies the present study provided no evidence that . . . GCE supplementation can modify calorie intake in overweight individuals consuming their habitual diet."[18]

30.    In short, these studies demonstrate that HCA supplementation does not support appetite control.

---

[13] *Id.* at 1092.
[14] *Id.* at 1087.
[15] *Id.* at 1093.
[16] *Id.* at 1087.
[17] Kim et al., *Does Glycine max leaves or Garcinia Cambogia promote weight-loss or lower plasma cholesterol in overweight individuals: a randomized control trial*, 10 Nutr. J. 94, 100 (2011).
[18] *Id.*

**B.    HCA does not support increased energy expenditure and the other biological mechanisms of action by which it purportedly affects weight have been disproven**

31.    Not only is HCA not effective in supporting appetite control and lowering energy intake, as described below, randomized, placebo controlled studies demonstrate that HCA supplementation does not increase energy expenditure, fat oxidation, or glucose oxidation so that it could aid weight management.

32.    In addition to demonstrating that Garcinia Cambogia/HCA does not support appetite control, the studies performed by Kovacs also demonstrate that HCA is not effective in supporting weight management by increasing energy expenditure (metabolic rate) or fat oxidation.[19]

33.    In the study, the authors "hypothesised that HCA supplementation might affect appetite and body weight regulation by increasing fat oxidation and metabolic rate, reflected by an increase in energy expenditure."[20]

34.    However, "no effect of HCA on fat oxidation or 24 h energy expenditure was found" when compared to a placebo.[21]

35.    Compared to placebo, HCA did not increase fat oxidation, which was measured by blood concentrations of glucose, insulin, lipids, triglycerides, and other substrates. "Fasting plasma glucose concentration before and after intervention was similar for each treatment. Plasma glucose concentration was reduced as a result of intervention with PLA . . . , but not with HCA and HCA +MCT. However, reduction in plasma glucose was not different between treatments. Fasting plasma FFA, glycerol, triglycerides and insulin concentrations before and after intervention as well as changes during intervention were

---

[19] Kovacs II, *supra* n. 8, at 1087.
[20] *Id.* at 1088.
[21] *Id.* at 1092.

*Nathan v. Vitamin Shoppe Inc.*
FIRST AMENDED COMPLAINT

similar between treatments. There was no difference in plasma BHB after intervention or in plasma BHB change during intervention between treatments."[22]

36.    Further, "[t]here was no difference in SMR [sleeping metabolic rate], RMR [resting metabolic rate], DIT [diet-induced thermogenesis] and AEE [activity-induced energy expenditure] between treatments."[23]

37.    Given that HCA supplementation did not affect fat oxidation or energy expenditure, "[t]he results did not support the hypothesis that HCA supplementation may be effective on appetite and weight control by increasing fat oxidation."[24]

38.    Likewise, a "double blind, placebo controlled, randomized, crossover study" published in the International Journal of Obesity concluded that HCA supplementation was not effective in people consuming a typical mixed diet because it does not affect energy expenditure, fat oxidation, or glucose oxidation.[25]

39.    As the authors noted, (other than by decreasing energy intake or increasing energy expenditure) there are "two mechanism" of action by which HCA might affect weight "1) by inhibiting or limiting the capacity for de novo lipogenesis and 2) via inhibiting malonyl CoA formation, which in turn, would . . . increase fat oxidation,"[26]

40.    The authors of the study noted that "[t]here are reports to support the role of (-)-HCA in promoting weight loss during a de novo lipogenic state in rodent studies, however,

---

[22] *Id.* at 1091.
[23] *Id.* at 1091.
[24] *Id.* at 1092.
[25] AD Kriketos et al., *-hydroxycitric acid does not affect energy expenditure and substrate oxidation in adult males in a post-absorptive state*, 23 Int. J. Obesity 867 (1999).
[26] *Id.* at 867-68. *See also* S. Heymsfield et al., *Garcinia Cambogia (Hydroxycitric Acid) as a potential antiobestiy agent*, 280 J. Am. Med. Assoc. 1596, 1599 (1998) (HCA's purported mechanism of action is "competitive[] inhibit[ion of the] catalytic action by the [citrate cleavage] enzyme. Citrate, entering the cytoplasm from mitochondria, cannot be cleaved to release acetyl coenzyme A, the substrate for de novo fatty acid synthesis").

most people taking these weight loss supplements are not consuming diets that produce substrate de novo lipogenesis."[27]

41.    Thus, even if HCA operated through the first mechanism (limiting the capacity for de novo lipogenesis), as the authors explained, this is of little relevance to those consuming a typical western diet since de novo lipogenesis rarely occurs under such conditions. "If a high carbohydrate diet is needed in order for (-)-HCA to impact upon body weight, it may have a limited application for obesity treatment/prevention. First, few (if any) people in the US who are needing to lose weight, consume such a diet. The typical diet in the US is relatively low in carbohydrate and high in fat, and would not promote de novo lipogenesis. Second, Schwartz et al have found that human subjects show little de novo lipogenesis, even when given a very high carbohydrate diet."[28]

42.    In other words, "de novo lipogenesis is normally regarded as being of little importance in the development of obesity (31, 32). Therefore, in order for HCA to qualify as an effective metabolic antiobesity agent, it should produce a stimulating effect on skeletal muscle fat oxidation or total energy expenditure."[29]

43.    Therefore, they designed their study to examine "the effect of (--)-HCA on the regulation of metabolism in humans consuming a typical Western diet (approx. $30 \pm 35\%$ total calories as fat)."[30]

44.    The study found HCA supplementation had no effect on metabolism as measured by respiratory quotient (RQ) and energy expenditure (EE) compared to a placebo.[31]

---

[27] AD Kriketos, *supra* n. 24, at 868.
[28] *Id.* at 872. *See also* Kovacs II, *supra* n. 8, at 1092 ("An excess energy intake as carbohydrate is needed to promote de novo lipogenesis and to increase glycogen synthesis.").
[29] Van Loon L et al., *Effects of acute (-)-hydroxycitrate supplementation on substrate metabolism at rest and during exercise in humans,* 72 Am. J. Clin. Nutr. 1445, 1448 (2000).
[30] AD Kriketos, *supra* n. 24, at 868.
[31] *Id.* at 870-71.

45.    HCA supplementation also had no effect "on circulating concentrations of blood substrates associated with fat oxidation and regulation of glucose metabolism."[32]

46.    Therefore, the authors concluded that "the inability to demonstrate metabolic changes consistent with citrate lyase inhibition suggests that this mechanism is not operable to promote weight reduction . . . ."[33]

47.    Thus, the study found that the second possible mechanism of action was also ineffective.

48.    Other studies have likewise demonstrated, HCA has no more effect than a placebo on fat oxidation or energy expenditure.[34]

49.    For example, in 2000, the American Journal of Clinical Nutrition published a study that found that "HCA, even when provided in large quantities, does not increase total fat oxidation [or energy expenditure] in vivo."[35]

50.    The "study showed that large doses of G. Cambogia extract [(18 ± 0.4 g HCA)] do get absorbed in the intestine and can lead to a substantial increase in plasma HCA concentrations. However, this *does not affect fat and carbohydrate oxidation rates*."[36]

51.    In the study, "energy expenditure and fat and carbohydrate oxidation at rest and during exercise were not significantly different between trials (Figure 4). In addition, we did not observe any significant differences in plasma fatty acid, glycerol, or glucose concentrations between trials."

---

[32] *Id.* at 872.
[33] *Id.* at 873.
[34] *See*, *e.g.*, Van Loon L et al., *Effects of acute (-)-hydroxycitrate supplementation on substrate metabolism at rest and during exercise in humans,* 72 Am. J. Clin. Nutr. 1445, 1448 (2000) ("conclude[ing] that plasma HCA availability does not increase energy expenditure or stimulate skeletal muscle fat oxidation.").
[35] *Id.* at 1445.
[36] *Id.* at 1449.

52.    In short, HCA even in high doses "does not affect fat and carbohydrate oxidation rates at rest or during moderate-intensity exercise in endurance-trained humans."[37]

53.    "Accordingly, a direct effect of HCA on fat oxidation seems unlikely to contribute to its claimed antiobesity or ergogenic potential."[38]

54.    Thus, the authors "conclude[d] that plasma HCA availability does not increase energy expenditure or stimulate skeletal muscle fat oxidation."[39]

55.    The authors concluded that the study "did not detect any indication that HCA supplementation can affect whole-body metabolism in humans. As such, the only applicability of HCA as an antiobesity agent seems to be the suggested reduction of appetite and food intake."[40] But as discussed above, the next year (2001), the Kovacs I and Kovacs II studies demonstrated that HCA does not reduce appetite or energy intake.

56.    Given that the biological mechanisms of action through which HCA is theorized to affect weight and body composition have been shown not to work, it is unsurprising that numerous other randomized, placebo controlled clinical trials have found that HCA is no more effective than a placebo in promoting weight loss or otherwise affecting weight or body composition.

57.    In 1998, Dr. Steven Heymsfield and his colleagues published the first study to "examine the effectiveness of hydroxycitric acid for weight loss and fat mass reduction in a rigorous controlled trial."[41]

58.    Dr. Heymsfield and his team of researchers specifically noted that, at that time, the "evidence of human hydroxycitric acid efficacy for weight control is based largely on studies with small sample sizes, studies that failed to include a placebo-treated group, and use

---

[37] *Id.*

[38] *Id.*

[39] *Id.* at 1448.

[40] *Id.*

[41] S. Heymsfield et al., *Garcinia Cambogia (Hydroxycitric Acid) as a potential antiobestiy agent*, 280 J. Am. Med. Assoc. 1596, 1596 (1998).

of inaccurate measures of body lipid change." Therefore, their "investigation was designed to overcome limitations of earlier studies and examine the effectiveness of hydroxycitric acid for weight loss and fat mass reduction in a rigorous controlled trial." [42]

59.    The study was "carried out using accepted clinical trial design procedures and applying accurate body composition [measurement] methods," and was designed "to evaluate the efficacy of G. cambogia for body weight and fat mass loss in overweight human subjects."[43]

60.    The "study, carried out during a 12-week evaluation period and using accepted experimental design and in vivo analytic methods, failed to support the hypothesis that hydroxycitric acid as prescribed promotes either additional weight or fat mass loss beyond that observed with placebo."[44]

61.    "Specifically, body weight and fat mass change during the 12-week study period did not differ significantly between placebo and treatment groups."

62.    "Additionally, there were no observed selective fat-mobilizing effects specifically attributable to the active agent, hydroxycitric acid."[45]

63.    The researchers specifically noted that the difference in weight loss between the subjects that received the HCA supplementation and those that received the placebo was "not statistically significant."[46]

64.    Further, "[b]ody weight change differences remained nonsignificant after controlling for patient starting weight, sex, and age,"[47] and "[i]n no case did any secondary

---

[42] *Id.*
[43] *Id.*
[44] *Id.* at 1599.
[45] *Id.*
[46] *Id.* at 1598.
[47] *Id.*

*Nathan v. Vitamin Shoppe Inc.*
FIRST AMENDED COMPLAINT

analysis indicate any statistically significant effect for the active compound to produce more weight loss than placebo."[48]

65.    In addition, the study found that Garcinia Cambogia had no effect on fat loss.[49] Rather, "the percentage of fat mass differences also was nonsignificant," and "in no case did analysis indicate any statistically significant effect for the active compound to produce a different percentage of body fat mass loss than the placebo."[50]

66.    In sum, this rigorous study, which "was designed to overcome limitations of earlier studies," "failed to support a specific weight loss effect of G Cambogia."[51]

67.    The results of more recent studies have been the same: "Garcinia cambogia extract did not show dietary efficacy."[52]

68.    A 2008 study published in the Journal of Clinical Biochemistry and Nutrition, found that "hydroxycitric acid had no significant effect on the body component" and that "dietary efficacy was not indicated."[53]

69.    That study, which employed a "double-blind, non-cross-matching test,"[54] found that "Garcinia cambogia extract did not show dietary efficacy,"[55] with no differences in weight gain or weight loss between treatment groups.[56]

---

[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.* at 1599.
[52] Yoshikazu Yonei et. al, *Effects on the Human Body of a Dietary Supplement Containing L-Carnitine and Garcinia Cambogia Extract: A Study using Double-blind Tests*, 42 J. Clin. Biochem. Nutr. 89, 101 (2008).
[53] *Id.* at 100.
[54] *Id.* at 90.
[55] *Id.* at 101.
[56] *Id.* at 95, Table 5.

70.    A 2011 study publish in the prominent Nutrition Journal found that Garcinia Cambogia extract supplementation "failed to promote weight-loss or any clinically significant change in % body fat."[57]

71.    The researchers noted that "the evidence for the effectiveness of natural food supplements to promote weight-loss and improve health is largely derived from animal studies. Therefore, it is essential randomized double-blind placebo-controlled trials (RCTs) are conducted to determine the effectiveness of natural food supplements to promote weight-loss."[58]

72.    The randomized double-blind placebo-controlled trial found that "GCE supplementation was not effective in promoting weight-loss in overweight individuals."[59]

73.    Further, "[i]n agreement with past studies the present study provided no evidence that [garcinia cambogia extract] GCE supplementation can modify calorie intake in overweight individuals consuming their habitual diet."[60]

74.    Like the previous studies, "neither EGML nor GCE supplementation alone can promote weight-loss in overweight individuals."[61]

75.    These studies, all of which were controlled human trials, affirmatively demonstrate that Garcinia Cambogia Extract (HCA) does not aid weight management or appetite control.

---

[57] Kim et al., *Does Glycine max leaves or Garcinia Cambogia promote weight-loss or lower plasma cholesterol in overweight individuals: a randomized control trial*, 10 Nutr. J. 94, 94 (2011).
[58] *Id*. at 94-95.
[59] *Id*. at 101.
[60] *Id*. at 102.
[61] *Id*.

13

## II.    Scientific Research Demonstrates that Chromium Is Not Effective in Supporting Weight Management, Glucose Metabolism, or Weight Loss

76.    According to Vitamin Shoppe, although the Product is primarily composed of Garcinia Cambogia, "Chromium added to support glucose metabolism."[62] However, scientific studies demonstrate that chromium does not support weight management, glucose metabolism, or weight loss.

### A.    Chromium does not support weight management

77.    In 1997, a study published in the International Journal of Obesity affirmatively demonstrated that chromium supplementation does not aid in "weight maintenance."[63]

78.    Specifically, the study tested "whether supplementation of carbohydrate, chromium, dietary fibre and caffeine is effective for maintenance of weight-loss in the long-term."[64]

79.    The study consisted of two phases. In the first phase, all participants "took part in a VLED [very low energy diet] intervention for eight weeks in order to lose weight."[65]

80.    In the second phase, "the maintenance of body weight after VLED was followed for 16 months."[66] In this phase participants were randomly split into two test groups and a control (placebo) group. Participants in the first test group, the CHO+ group, were given a supplement that contained "50 g CHO [carbohydrates] (42% glucose and 58% maltodextrins), 200 mg Cr-Pic (CHO+), 20 g soluble fibre (Benefiber®) and 100 mg caffeine." Participants in the second test group, the CHO group, were given a "CHO supplement [that] contained 50 g CHO (42% glucose and 58% maltodextrins). The control group did not receive any supplementation.

---

[62] Attachment 1 at 2.

[63] WJ Pasman et al., *The effectiveness of long-term supplementation of carbohydrate, chromium, fibre and caffeine on weight maintenance*, 21 Int. J. Obesity 1143 (1997).

[64] *Id.* at 1143.

[65] *Id.* at 1144.

[66] *Id.*

81.    The study found that "[t]he amount and course of changes in BW [body weight] was equal for the supplemented and control groups" and after 16 months, the "average regain" in weight "was similar for all the groups."[67]

82.    In addition, "No differences in body fat percentage was found between the three groups as a consequence of Cr-Pic [chromium] supplementation."[68]

83.    Thus, the study demonstrated that "chromium intake did not result in significant changes in blood parameters and body composition"[69] and that "Supplementation of either CHO in combination with Cr-Pic, dietary fibre and caffeine or CHO alone, *has no beneficial effect on weight maintenance in the long-term.*"[70]

**B.    Chromium does not support glucose metabolism**

84.    Vitamin Shoppe claims that chromium is specifically added to the Product "to support glucose metabolism," but studies likewise demonstrate that it does not support glucose metabolism.

85.    In addition to demonstrating that chromium does not support weight management, the Pasman study "indicate[d] that supplementation with [chromium] was not effective on fasted glucose and insulin concentrations."[71]

86.    Likewise, in 2011, a study conducted by the National Institutes of Health, designed to "investigate the effects of daily chromium picolinate supplementation on serum measures of glucose tolerance and insulin sensitivity," found chromium supplementation did not affect glucose metabolism.[72]

---

[67] *Id.* at 1146.
[68] *Id.* at 1149.
[69] *Id.* at 1143.
[70] *Id.* at 1149.
[71] *Id.*
[72] Ather Ali et al., *Chromium Effects on Glucose Tolerance and Insulin Sesitivity in Persons at Risk for Diabetes Mellitus*, 17 Endocr. Pract. 1, 1 (2011).

*Nathan v. Vitamin Shoppe Inc.*
FIRST AMENDED COMPLAINT

87.    The study found that chromium supplementation did not cause changes in any of the key indicators of glucose metabolism including "FPG [fasting plasma glucose], 2-hour plasma glucose levels, fasting or 2-hour post–oral glucose tolerance test insulin levels, or HOMA-IR as compared with placebo after 6 months."[73] In other words, there were "no changes . . . in glucose level, insulin level, or HOMA-IR (all, $P>.05$) after 6 months of chromium at either dosage level (500 mcg or 1000 mcg daily) when compared with placebo."[74]

88.    Likewise, "[n]one of the secondary outcomes improved with either chromium dosage compared with placebo ($P>.05$)."[75] More specifically, "[s]ix months of chromium supplementation (500 mcg or 1000 mcg) was not associated with any significant changes in glycohemoglobin, weight, waist circumference, BMI, blood pressure, total cholesterol, high-density lipoprotein cholesterol, low-density lipoprotein cholesterol, triglycerides, or urine microalbumin compared with placebo." And "[t]here were no other significant changes observed at the 6-month postintervention assessment on all remaining outcome measures."[76]

89.    Thus, "Chromium supplementation does not appear to ameliorate insulin resistance or impaired glucose metabolism."[77]

90.    Finally, a meta-analysis published in the Journal Diabetes Care in 2007, in which the authors performed "[a] systematic review of the effect of chromium supplementation on glucose metabolism and lipid levels" concluded that there is "[n]o significant effect of chromium on lipid or glucose metabolism . . . in people without diabetes."[78]

---

[73] *Id.* at 5.
[74] *Id.* at 1.
[75] *Id.* at 1.
[76] *Id.* at 5.
[77] *Id.* at 1.
[78] Ethan M. Balk et al., *Effect of Chromium Supplementation on Glucose Metabolism and Lipids: A systematic review of randomized controlled trials*, 30 Diabetes Care 2154, 2154 (2007).

**C.    Chromium does not support weight loss**

91.    Like Garcinia Cambogia or HCA, scientific studies demonstrate that chromium is not effective in aiding weight loss.

92.    One of the first rigorous studies of the effect of chromium supplementation on weight loss and fat metabolism found that "12 weeks of chromium supplementation in conjunction with strength training does not increase lean body mass and muscle strength or decrease percent body fat."[79]

93.    Similarly, in a 1996 study published in the prominent American journal of clinical nutrition found that "routine chromium supplementation has no beneficial effects on body-composition change."[80]

94.    Similarly, a 2001 study found that chromium supplementation "did not significantly affect body composition. . . in moderately obese women placed on an exercise program."[81]

95.    While initial interest in chromium as a weight loss aid was generated "based on unpublished, flawed studies that have not been subjected to the peer review process," attempts to replicate these results using "better experimental design" have shown that chromium supplementation "does not increase lean muscle mass or decrease body fat."[82]

---

[79] Hallmark, M. A., et al., *Effects of chromium supplementation and resistive training on muscle strength and lean body mass in untrained men*, 28 Med. & Sci. Sports & Exercise 139, 139 (1993).

[80] Lukaski, H., et al., *Chromium supplementation and resistance training: Effects on body composition, strength, and trace element status of men*, 63 Am. J. Clin. Nutr. 954 (1996).

[81] Vople et al., *Effect of chromium supplementation and exercise on body composition, resting metabolic rate and selected biochemical parameters in moderately obese women following an exercise program*, 20 J. Am. Coll. Nutr. 293 (2001).

[82] Melvin Williams, *Dietary Supplements and Sports Performance*, 2 Int. Soc. Sports Nutr. 43, 46 (2005).

*Nathan v. Vitamin Shoppe Inc.*
FIRST AMENDED COMPLAINT

96.    In short, "the limited studies to date indicate that chromium supplements do not promote general muscle gain and fat loss, as determined by various methods of body-composition assessment."[83]

**III.    Defendant's Sale and Marketing of the Product**

97.    Defendant has distributed, marketed, and sold the Product on a nationwide basis, including California, for at least the past several years.

98.    The Product comes in "caplets" form and are sold in various quantities, including bottles of 90 and 180 caplets.

---

[83] Lukaski, *Magnesium, zinc, and chromium nutriture and physical activity*, 72 Am. J. Clin. Nutr. 585, 590 (2000).

*Nathan v. Vitamin Shoppe Inc.*
FIRST AMENDED COMPLAINT

**IV.    Defendant Markets the Product with False and Misleading Labeling Claims**

99.    Defendant markets and advertises the Product as an effective weight-loss supplement through claims placed directly on the bottle Product despite that it provides no such benefits.

100.    Below are true and correct exemplars of the Product's labeling.



Figure 1.



Figure 2.

101.    **Misleading "Appetite Control" Claim:** Defendant prominently labels the Product with the phrase "Appetite Control."  This claim is misleading because it conveys that the Product will aid consumers control their appetite when in fact the only ingredient in the Product that is intended to provide support for appetite control, HCA, has been shown to be ineffective in aiding appetite control and has no effect on satiety or food intake.

102.    **Misleading "Weight Management" claim**: Defendant prominently labels the Product with the phrase "Weight Management." This claim is misleading because it conveys

19

that the Product will aid consumers manage their weight, when in fact the Product's only "active" ingredients have been shown to be incapable of aiding weight management.

103.    Together, the "Weight Management" and "Appetite Control" claims, are further misleading because they suggest that by providing appetite control benefits, the Product is capable of aiding consumers manage their weight and in fact lose weight. This message, however, is misleading because the Product's only "active" ingredients are incapable of providing any weight-loss benefits.

104.    In addition, during the class period, Vitamin Shoppe claimed on its website, that the Product, due to its Garcinia Cambogia content, "offers unique slimming benefits" and will "help you feel full and be less tempted to overeat."[84]  These claims are false or misleading because Garcinia Cambogia Extract or HCA does not support weight loss or fat reduction or otherwise affect body composition.

105.    In short, the claims on the packaging of the Product convey the message that the Product is an effective dietary aid, which is misleading because numerous studies demonstrate that the Product's only "active" ingredients do not aid appetite control or provide other weight related benefits.

## V.    The Labeling of the Product Violates California and Federal Labeling Laws

### A.    Any Violation of Federal Food Labeling Statutes or Regulations is a Violation of California Law

106.    Pursuant to the California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 109875 *et. seq.* (the "Sherman Law"), California has adopted the federal food and dietary supplement labeling requirements as its own. *See id.* § 110665 ("Any food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in Section 403(q) (21 U.S.C. Sec. 343(q)) of the federal act and the regulation adopted pursuant thereto."); *id.* § 110670 ("Any food is misbranded if its labeling does not conform with the requirements for nutrient content or health claims as set forth in Section

---

[84] Attachment 1 at 2.

403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulations adopted pursuant thereto.").

107.    For the purposes of labeling, "a dietary supplement shall be deemed to be a food." *See* 21 U.S.C. § 321(ff).

108.    The Federal Food Federal Food, Drug, and Cosmetic Act expressly authorizes state regulations, such as the Sherman Law, that are "identical to the requirement[s]" of the FDCA and federal regulations. *See* 21 U.S.C. § 343-1.

109.    Because the Sherman Law's requirements are identical to the requirements of the Federal Food, Drug, and Cosmetic Act and FDA regulations the Sherman law is explicitly authorized by the FDCA.

## B.    The Product's False and Misleading Labeling Claims Render it Misbranded Under California and Federal Law

110.    Defendant's deceptive statements described herein violate Cal. Health & Safety Code §§ 110390 and 110660, and 21 U.S.C. § 343(a), which deem a food or dietary supplement misbranded if its labeling is "false or misleading in any particular."

111.    Further, Defendant's labeling of the Product is misleading, and thus misbranded, because "it fails to reveal facts that are material in light of other representations." 21 C.F.R § 1.21. For example, in light of the Product's weight-loss claims the labeling fails to reveal the fact that numerous randomized, controlled human trials demonstrate that Garcinia Cambogia and Chromium are not effective or capable of aiding weight loss.

## C.    The Product is Misbranded Because it Bears Unauthorized Structure Function Claims

112.    The Product is further misbranded because its labeling and packaging bear structure function claims even though the Product does not meet the requirements to make such claims.

113.    Specifically, the statements "Weight Management" and "Appetite Control" are structure function claims.

*Nathan v. Vitamin Shoppe Inc.*
FIRST AMENDED COMPLAINT

114.    These claims violate 21 U.S.C. 343(r)(6) because the weight of scientific evidence does not support these claims as being "truthful and not misleading" as required. *See* 21 U.S.C. 343(r)(6). To the contrary, scientific evidence, as alleged herein, affirmatively demonstrates that the Product's purportedly "active" ingredients are incapable of providing any dietary benefits.

## VI.    Plaintiff's Purchase, Reliance, and Injury

115.    In or around February 2017 in San Diego, Ms. Nathan purchased a 180-caplet bottle of Defendant's Garcinia Cambogia Extract for approximately $20 from Vitamin Shoppe, in reliance on the Product's misleading dietary claims.

116.    When deciding to purchase the Product, Plaintiff read and relied on the claims "Weight Management" and "Appetite Control," which appear directly on the Product's label and conveyed the message to the reasonable consumer that the Product was an effective dietary aid that would aid weight loss.

117.    Based on these representations, Plaintiff believed the Product was an effective dietary aid that would provide "appetite control," help her effectively manage her weight.

118.    When purchasing the Product, Plaintiff was seeking a product that had the qualities described on the Product's label, namely, an effective "weight management" and "appetite control" supplement. She was also was seeking a Product that would help her lose weight by allowing her to better control her appetite.

119.    The representations on the Product's label were and are false and misleading, and had the capacity, tendency, and likelihood to confuse or confound Plaintiff and other consumers acting reasonably (including the putative Class) because, as described in detail herein, the Product cannot deliver the purported benefits and is no more effective than a placebo.

120.    Plaintiff acted reasonably in relying on the challenged claims that Defendant intentionally placed on the Product's label and packaging with the intent to induce average consumers into purchasing it.

121. Instead of receiving a product that had actual beneficial "appetite control" and weight management properties, the Product that Plaintiff and the Class received was one that does not and cannot deliver the claimed benefits.

122. The Product, which has the sole intended purpose is as a dietary aid, is worthless since it is incapable of providing any such benefits.

123. The Product costs more than similar products without misleading labeling, and would have cost less absent the false and misleading statements.

124. Plaintiff paid more for the Product, and would only have been willing to pay less, or unwilling to purchase it at all, absent the false and misleading labeling statements complained of herein.

125. For these reasons, the Product was worth less than what Plaintiff paid for it.

126. Plaintiff would not have purchased the Product if she knew it was misbranded pursuant to California and FDA regulations and could not be legally sold or held and thus is legally worthless.

127. Plaintiff would not have purchased the Product if she knew that its labeling claims were false or misleading, or that the Product is incapable of providing the claimed benefits.

128. Plaintiff lost money as a result of Defendant's deceptive claims and practices in that she did not receive what she paid for when purchasing the Product.

129. Plaintiff detrimentally altered her position and suffered damages in an amount equal to the amount she paid for the Product.

130. The senior officers and directors of Defendant allowed the Product to be sold with full knowledge or reckless disregard that the challenged claims are fraudulent, unlawful, and misleading.

## CLASS ACTION ALLEGATIONS

131. California Code of Civil Procedure section 382 provides that "when the question is one of a common or general interest, of many persons, or when the parties are numerous,

*Nathan v. Vitamin Shoppe Inc.*
FIRST AMENDED COMPLAINT

and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

132.   While reserving the right to redefine or amend the class definition prior to seeking class certification, plaintiff brings this suit as a class action pursuant to Cal. Code Civ. P. § 382 on behalf of herself and a Class of all persons in the California who, on or after from June 26, 2013 (the "Class Period"), purchased, for personal or household use, and not for resale or distribution purposes Vitamin Shoppe's Garcinia Cambogia (the "Class").

133.   The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

134.   Questions of law and fact common to plaintiff and the Class include:

a.   whether Defendant communicated a message regarding weight-management and appetite-control benefits of the Product through its packaging and advertising;

b.   whether that message was material, or likely to be material to a reasonable consumer;

c.   whether the challenged claims discussed above are false, misleading, or reasonably likely to deceive a reasonable consumer;

d.   whether Defendant's conduct violates public policy;

e.   whether Defendant's conduct violates state and federal food statutes or regulations;

f.   whether the Product is misbranded;

g.   the proper amount of damages, including punitive damages;

h.   the proper amount of restitution;

i.   the proper injunctive relief, including a corrective advertising campaign; and

j.   the proper amount of attorneys' fees.

135.    These common questions of law and fact predominate over questions that affect only individual Class Members.

136.    Plaintiff's claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct. Specifically, all Class Members, including Plaintiff, were subjected to the same misleading and deceptive conduct when they purchased the challenged products, and suffered economic injury because the products were and are misrepresented. Absent Defendant's business practice of deceptively and unlawfully labeling its Product, Plaintiff and Class Members would not have purchased the Product.

137.    Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action litigation, and specifically in litigation involving the false and misleading advertising of foods.

138.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

139.    Questions of law and fact common to the Class predominate over any questions affecting only individual Class Members.

140.    Defendant has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violations of the Unfair Competition Law

### Cal. Bus. & Prof. Code §§ 17200 *et seq*.

141.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

142.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

143.    The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute business acts and practices.

### Fraudulent

144.    A statement or practice is "fraudulent" under the UCL if it is likely to mislead or deceive the public, applying an objective reasonable consumer test.

145.    As set forth herein, Defendant's claims relating to the Product are likely to mislead reasonable consumers to believe the Product can provide weight-loss benefits, when it cannot.

### Unlawful

146.    The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

• Cal. Bus. & Prof. Code § 12606.2 and 21 C.F.R. § 100.100;

• The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

• The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;

• The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*; and

• The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq.*

### Unfair

147.    Defendant's conduct with respect to the labeling, advertising, and sale of the Product was "unfair" because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

148.    Defendant's conduct with respect to the labeling, advertising, and sale of the Product was and is also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not limited to the Consumers

Legal Remedies Act, the False Advertising Law, portions of the Federal Food, Drug, and Cosmetic Act, and portions of the California Sherman Food, Drug, and Cosmetic Law.

149.    Defendant's conduct with respect to the labeling, advertising, and sale of the Product was and is also unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves could reasonably have avoided.

150.    Defendant profited from its sale of the falsely, deceptively, and unlawfully advertised and packaged Product to unwary consumers.

151.    Plaintiff and Class Members are likely to continue to be damaged by Defendant's deceptive trade practices, because Defendant continues to disseminate misleading information on the Product's packaging. Thus, injunctive relief enjoining Defendant's deceptive practices is proper.

152.    Defendant's conduct caused and continues to cause substantial injury to Plaintiff and the other Class Members. Plaintiff has suffered injury in fact as a result of Defendant's unlawful conduct.

153.    In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

154.    Plaintiff and the Class also seek an order for and restitution of all monies from the sale of the Product, which were unjustly acquired through acts of unlawful competition.

**SECOND CAUSE OF ACTION**

**Violations of the False Advertising Law**

**Cal. Bus. & Prof. Code §§ 17500 *et seq*.**

155.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

156.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or

personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

157.   It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

158.   As alleged herein, the advertisements, labeling, policies, acts, and practices of Defendant relating to the Product misled consumers acting reasonably as to the effectiveness and weight-loss properties of the Product.

159.   Plaintiff suffered injury in fact as a result of Defendant's actions as set forth herein because she purchased the Product in reliance on Defendant's false and misleading labeling claims that the Product, among other things, aids in weight management and provides appetite control.

160.   Defendant's business practices as alleged herein constitute deceptive, untrue, and misleading advertising pursuant to the FAL because Defendant has advertised the Product in a manner that is untrue and misleading, which Defendant knew or reasonably should have known, and omitted material information from its advertising.

161.   Defendant profited from its sale of the falsely and deceptively advertised Product to unwary consumers.

162.   As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

163.   Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of herself and the Class, seeks an order enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

**THIRD CAUSE OF ACTION**

**Violations of the Consumer Legal Remedies Act**

**Cal. Civ. Code §§ 1750 *et seq.***

164.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

165.   The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

166.   Defendant's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Product for personal, family, or household purposes by Plaintiff and Class Members, and violated and continue to violate the following sections of the CLRA:

a.      § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b.      § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.      § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.      § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

167.   Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Product to unwary consumers.

168.   Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

169.   As a result, Plaintiff and the Class have suffered harm, and therefore seek (a) actual damages in the amount of the total retail sales price of the Product sold to all Class Members, (b) punitive damages in an amount sufficient to deter and punish, (c) injunctive relief in the form of modified advertising and a corrective advertising plan, and (d) restitution.

170.   Pursuant to California Civil Code § 1782, Plaintiff notified Defendant in writing by certified mail, return receipt requested, of her claims, and of the particular violations of § 1770 of the CLRA, but Defendant failed to remedy the violations within 30 days.

171.   In compliance with Cal. Civ. Code § 1780(d), Plaintiff's affidavit of venue was filed concurrently with the original complaint.

## FOURTH CAUSE OF ACTION

### Breach of Express Warranties

### Cal. Com. Code § 2313(1)

172.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

173.   Through the Product's label and advertising, Defendant made affirmations of fact or promises, or description of goods as being capable of supporting "appetite control" and "weight management," which were "part of the basis of the bargain," in that Plaintiff and the Class purchased the Product in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

174.   Defendant breached the express warranties by selling a Product that does not and cannot provide the promised dietary benefits.

175.   That breach actually and proximately caused injury in the form of the lost purchase price that Plaintiff and Class members paid for the Product.

## FIFTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability

### Cal. Com. Code § 2314

176.   Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

177.   Defendant, through its acts and omissions set forth herein, in the sale, marketing, and promotion of the Product, made representations to Plaintiff and the Class that, among other things, the Product would aid in weight management and appetite control.

178.    Plaintiff and the Class bought the Product manufactured, advertised, and sold by Defendant, as described herein.

179.    Defendant is a merchant with respect to the goods of this kind which were sold to Plaintiff and the Class, and there was, in the sale to Plaintiff and other consumers, an implied warranty that those goods were merchantable.

180.    However, Defendant breached that implied warranty in that the Product does not aid in weight management and appetite control.

181.    As an actual and proximate result of Defendant's conduct, Plaintiff and the Class did not receive goods as impliedly warranted by Defendant to be merchantable in that it did not conform to promises and affirmations made on the container or label of the goods nor is it fit for its ordinary purpose, aiding in weight management and appetite control.

182.    Plaintiff and Class have sustained damages as a proximate result of the foregoing breach of implied warranty in the amount of the Product's purchase prices.

## PRAYER FOR RELIEF

183.    Wherefore, Plaintiff, on behalf of herself, all others similarly situated and the general public, prays for judgment against Defendant as to each and every cause of action, and the following remedies:

A.    An Order declaring this action to be a proper class action, appointing Plaintiff as class representative, and appointing undersigned counsel as class counsel;

B.    An Order requiring Defendant to bear the cost of class notice;

C.    An Order compelling Defendant to conduct a corrective advertising campaign;

D.    An Order compelling Defendant to destroy all misleading and deceptive advertising materials and product labels, and to recall all offending Products;

E.   An Order requiring Defendant to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

F.   An Order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, plus pre-and post-judgment interest thereon;

G.   An Order requiring Defendant to pay actual and punitive damages where permitted under law;

H.   An award of attorneys' fees and costs; and

I.   Any other and further relief that Court deems necessary, just, or proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 20, 2018

/s/ Paul K. Joseph
**THE LAW OFFICE OF PAUL K. JOSEPH, PC**
PAUL K. JOSEPH
*paul@pauljosephlaw.com*
4125 W. Point Loma Blvd., No. 206
San Diego, CA 92110
Phone: (619) 767-0356
Fax: (619) 331-2943
***Counsel for Plaintiff and the Proposed Class***

*Nathan v. Vitamin Shoppe Inc.*
FIRST AMENDED COMPLAINT

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2018 I served the foregoing **FIRST AMENDED COMPLAINT** on counsel of record for all parties in this action, by notice of electronic filing, which was automatically generated by the Court's CM/ECF system at the time the document was filed with the Court.


Dated: February 20, 2018                    /s/ Paul K. Joseph
                                            Paul K. Joseph